**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────

**BRENDA LAMERE,**

                              **Plaintiff,**

     -against-                              03-CV-356


**NEW YORK STATE OFFICE FOR THE AGING,**
**NEAL LANE, JACK TUCK, JOHN J. LYNCH,**
**and ROBERT BUSH,**


                              **Defendants.**
────────────────────────────────────────

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                    **DECISION & ORDER**

**I.  INTRODUCTION**

     Plaintiff has instituted the instant matter alleging hostile

work environment sexual harassment and impermissible retaliation,

in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.* ("Title VII") and the New York State Human

Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYSHRL"). She also

brings state law claims against various defendants asserting that

they aided and abetted the discrimination that occurred in the work

place, and that their conduct amounted to assault, battery,

negligence, and the intentional infliction of emotional distress

1

under New York's common law.  Before the Court are two motions for summary judgment, one by Defendant Tuck, and the other by the remaining defendants.  For the reasons that follow, both motions are granted in part and denied in part.

## II.   STANDARD OF REVIEW

The Court will apply the well-settled standard for deciding summary judgment motions in discrimination actions. See FED. R. CIV. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

## III.   BACKGROUND

The Court has reviewed the parties' Local Rule 7.1 Statements and the competent evidence presented.  The following facts are taken in the light most favorable to Plaintiff, and all reasonable factual inferences are drawn in Plaintiff's favor. See Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002).

In August 1989, Plaintiff began employment with the State of New York in the Division of Housing and Community Renewal as a data entry machine operator. LaMere Aff. ¶ 7. In 1990, she transferred to a Keyboard Specialist position at the New York State Office for the Aging ("NYSOFA"). Id. On December 22, 1998, she was promoted to a Calculations Clerk II in NYSOFA's Finance and Administration office, id., and on September 2, 1999 she was again promoted to a

2

Grants Management Budget Specialist I ("GMBS I") position in NYSOFA's Finance and Administration Office. Id. Her direct supervisor in this last position was Defendant Jack Tuck ("Tuck"), who was a Grants Management Budget Specialist II ("GMBS II"). Id. ¶¶ 2, 7; State SOF ¶ 9.[1] Tuck and Plaintiff served as one of five "fiscal teams" in the Grants Administration Section of the Bureau of Fiscal Operations. State SOF ¶ 12. Plaintiff had no managerial responsibilities at NYSOFA. LaMere Aff. ¶ 7.

At all relevant times to this lawsuit, Defendant Neal Lane ("Lane") served as the Executive Deputy Director of NYSOFA; Defendant Robert Bush was the Deputy Director of Finance Administration at NYSOFA; and Defendant John J. Lynch was a Principal Accountant at NYSOFA. State SOF ¶¶ 6-8.  All of these individuals held positions superior to Tuck and Plaintiff in the office hierarchy. LaMere Aff. ¶ 7.[2]

When Plaintiff first began as a GMBS I, she viewed the department as "a nice place to work with a solid sense of camaraderie, trust and cooperation." Id. ¶ 10.  Plaintiff viewed her supervisor, Tuck, as a "nice guy, and over time thought [they] became friends." Id. ¶ 8. Plaintiff readily admits that when she first came under Tuck's supervision, the atmosphere in the office

---

[1] A citation to a defendant's Local Rule Statement of the Facts ("SOF") indicates that the Plaintiff has either admitted that paragraph of the statement, or there is no competent evidence contradicting it.

[2] There were also other managers above Tuck and Plaintiff who served as supervisors but who were not named as defendants in this action. See State SOF ¶¶ 12-13.

3

was "loud and friendly," that Tuck was known as a "jokester," and that she participated in the joking and office horseplay. State SOF ¶¶ 16-21.  For instance, Plaintiff shot rubber bands back at Tuck after he shot them at her, and she laughed and told jokes in the office. <u>See</u> State SOF ¶¶ 21-22.  However, Plaintiff contends that after her first year "things drastically changed." LaMere Aff. ¶ 10. As Plaintiff asserts in her affidavit:

> As time progressed, Tuck began to ridicule me, telling other workers I lacked experience or did not know how to deal with people; demanding that I answer his phone and doing his best to make me feel stupid in front of others. He began to make subtle comments while others were present, criticizing my work to belittle me and appear more dominant himself. Tuck made comments about my husband's baldness, told me I must be wearing a padded bra because he could not see my nipples, told me he wanted to see me naked, that he had arthritis and grabbing my breasts was the only thing that helped him and commented on minor errors in front of others and began to call me a liar and an exaggerator. As time went on he started changing my computer settings to display vulgar, inappropriate, demeaning and offensive references about me and my body such as "I want Jack" or "1-800 big boob" ... .

<u>Id.</u> ¶ 11.

Plaintiff also asserts that Tuck began to regularly yell the word "slut" in her presence, and, when she asked him to stop, he began yelling a variation of the word such as "sluth" or "lut." <u>Id.</u> ¶ 12. Tuck's use of these words caused Plaintiff to feel embarrassed, humiliated, and degraded. <u>Id.</u> ¶ 11.

In the summer of 2001, Tuck began producing written material that had sexual connotations and that explicitly referred to

4

Plaintiff's breasts.  First, Tuck made business cards for a fictional company called "NTB Industries."  <u>Id.</u> ¶ 15.  Tuck advised Plaintiff that the acronym NTB stood for "Nice Tits Brenda."  <u>Id.</u> In addition to the "NTB Industries" reference, the business cards read:  "Jack says 'I want them all the time!' Milky white perfection since 1968.[3]  Brenda Adams[4] President/Product. When you care enough to want the very best. Accept no substitutes. Email: NTB@Ntb.NTB."  <u>Id.</u>

Tuck also began preparing and leaving in Plaintiff's papers, drawers, and desk "mockups" of notes, memos, and birthday cards that had similar sexual connotations.  <u>Id.</u> ¶¶ 16-23.  An example of a birthday card "mockup" that Tuck prepared read:

> Ode to NTB
>
> Birthday breasts are perky and bright they seem so warm, so nice, so right, so round, so firm, so fully packed, a two course meal, a midday snack, a place to leave your cares behind, a place where you could lose your mind, maybe I've said more than I should, but on your day, you should feel good 33 you don't look that old so forgive me if I'm being bold and if I'm being a little brat HAPPY BIRTHDAY, lets leave it at that.

<u>Id.</u> ¶ 18.

An example of an office memo "mockup" that Tuck prepared read:

From: Jack Tuck

To: Adams, Brenda

---

[3] Plaintiff was born in 1968. LaMere Aff. ¶ 1.

[4] Prior to her current marriage, Plaintiff's last name was Adams.  LaMere Aff. ¶ 1.

Subject: Field Visits

Brenda;

I don't hate you. You are my main **SQUEEZE**! In fact, you know that I'm extremely **FONDLE YOU**, I mean fond of you. And I've been **FONDLING YOU** in my heart for over 10 years. Oh. Sorry. Again, it should be fond of you. And you have solemn promise right now that if you stay with me for the next three years, I will spend as much of that time as humanly possible **FONDLING YOU!!!** I mean being fond of you. Really. That's what I meant. Alright ... you got me. I mean **FONDLE!** I could lie to you. But I sincerely do mean it in the nicest, most affectionate way. Have a great two weeks.

Fondley, I mean Fondly

Jack

Id. ¶ 19.

Plaintiff estimates that Tuck prepared and left about 100 of these "mockups" between September 2001 and December 2001, id. ¶ 16, and Plaintiff found them to be "outrageous and upsetting." Id. ¶ 23. "[T]he constant barrage of sexual and degrading references directed specifically at [Plaintiff] was overwhelming [to her]. Each additional one built upon the other, and created an atmosphere that was sexual in tone, fearful, degrading and hostile." Id. ¶ 23.

Plaintiff asserts that in September 2001, just before she was to be married, Tuck began to grab and touch her breast and slap her buttocks. Id. ¶ 23. Plaintiff recalls that he touched her breast "on at least 10 occasions" and touched her buttocks "a number of other times as well." Id. ¶ 24. Plaintiff screamed at Tuck to stop, but he did not. Id. ¶¶ 24, 26.

Plaintiff contends that because she thought Tuck was her

6

friend and that he needed help, she encouraged him to get counseling which he said he would do but never did. Id. ¶ 24.  Tuck also began telling Plaintiff that he was "friends" with certain administrators and that "they were aware of his joking behavior and would not do anything about it." Id.

Around the end of October 2001, shortly after an incident where Tuck came up from behind Plaintiff and grabbed her breast in her cubical, Plaintiff was due to receive an evaluation from Tuck. Id. ¶ 28.  When Plaintiff approached Tuck in front of co-workers and asked Tuck when she would receive her evaluation, Tuck responded that it depended on how "squeezably soft" she was. Id. Plaintiff asserts that up to that point in time she had been unaware of any sexual harassment reporting procedure in the office, id. at ¶¶ 4, 64, but decided to contact Employee Assistance Program Coordinator Greg Gardiner about the situation. Id. ¶ 29.

On November 2, 2001, Gardiner and Plaintiff spoke and Plaintiff told Gardiner that she was being sexually harassed by her supervisor. State SOF ¶ 32. Plaintiff explained what she viewed as a situation that began as harmless joking and horseplay but that escalated into inappropriate written materials (described above) and unwelcome physical touching. See Gardiner Dep. p. 35. Plaintiff advised Gardiner of the incident in which Tuck touched her breast while in her cubical, but advised Gardner that Tuck "didn't mean any harm." State SOF ¶ 32. Plaintiff expressed to

7

Gardiner that she did not want "to hurt [Tuck] or cause a problem for [Tuck]. She didn't want to ruin his marriage. She didn't want to be the cause of him losing his job." Gardiner Dep. p. 36. Plaintiff told Gardiner that she thought Tuck was "basically a nice guy.  He just needs help." Id.; see State SOF ¶ 33.

Plaintiff insisted that Gardiner maintain confidentiality regarding their conversation. See Gardiner Dep. p. 36-38.  As EAP Coordinator, Gardiner was bound to keep conversations with employees confidential except in cases of child abuse or "where there was imminent danger to the employee or someone else." State SOF ¶ 31.  This conversation between Gardiner and Plaintiff was the first instance for Gardiner where an employee made an allegation to him of sexual harassment. Id. p. 36-37.  Gardiner advised Plaintiff to contact Carmen Cunningham, NYSOFA's Affirmative Action Director, id. pp. 38-39, but Plaintiff indicated, instead, that she was going to talk to Tuck herself to try to get him to change. Id. pp. 39-41. Plaintiff contends that she believed, based upon a prior incident that happened to her[5] and upon office rumors regarding a situation of other woman who complained about sexual harassment by a

_____

[5] In 1997, before Plaintiff began working for Tuck but while still working for NYSOFA, she learned that a woman named Debbie Dwyer was granted a promotion in violation of New York State Civil Service rules. LaMere Aff., ¶ 51.  Plaintiff complained and Dwyer's promotion was rescinded. Id. However, Plaintiff asserts that she "suffered the wrath of NYSOFA, since she questioned their authority." Id. She asserts that a number of employees began to ignore her and stopped speaking to her, and on a few occasions employees got out the elevator to avoid riding with her. Id.  In addition, Plaintiff "intercepted" an e-mail sent to her supervisor that said she was "poison," and she asserts that a co-worker told her that the co-worker's boss said that Plaintiff "would never get a promotion." Id.

supervisor,[6] that she would be ostracized and labeled a "complainer" if she filed a complaint but that nothing would be done. See LaMere Aff. ¶¶ 31, 52. After this meeting, Plaintiff sent Gardiner an e-mail indicating that she had spoken with Tuck and that things had gone well. Id. p. 41, 43; State SOF ¶ 35.

The next event of significance to this lawsuit occurred in December 2001 at NYSOFA's Christmas party.  Tuck grabbed Plaintiff's buttock after Tuck's wife left the party. LaMere Aff. ¶ 33.  Plaintiff was very upset by the incident and immediately advised a co-worker, Sandra Abrams, about it. Id. at ¶ 33; Abrams Aff. ¶ 3; Daly Dep. p. 14. Plaintiff had been confiding in Abrams about the on-going situation at work with Tuck, and when Abrams asked Plaintiff what she was going to do about the situation, Plaintiff said she was afraid to do anything. Abrams Aff. ¶ 3. Abrams then informed Lenore Daly, Assistant Counsel at NYSOFA, about the incident, and told Daly that because of Tuck's ongoing conduct in the work place she believed that Plaintiff "was in deep trouble. She's so upset, she can't sleep. She's going crazy." Daly Dep. 16; see Abrams Aff.¶ 3; LaMere Aff. ¶ 33.

Daly was unaware of the specific procedures for reporting a claim of sexual harassment at NYSOFA and testified that there were no procedures posted in this regard at that time. Daly Dep. pp. 21-

---

[6] Plaintiff believed that a woman named Susan Novak "claimed to have been hit or touched by her supervisor and when she complained about it, NYSOFA relocated her to a different floor and the supervisor involved was eventually promoted." Id. ¶ 52.

22.   Daly, also a member of the Employee Assistance Program
Committee at NYSOFA, was unaware of who to report the information
to. Id. pp. 7, 21-22. She decided to speak to Gardiner about the
situation without referencing Plaintiff's name, and to seek his
advice about the situation. Id. p. 23.  Gardiner quickly figured
out that the hypothetical employee Daly was referring to was
Plaintiff, and the two then shared their knowledge of Plaintiff's
situation.  Id. p. 23-24.  Together, Daly and Gardiner decided that
they should speak to Cunningham about the situation. Id. p. 24.

At their first meeting with Cunningham, Gardiner and Daly
spoke hypothetically to maintain the cloak of confidentiality that
surrounded revelations gained under the auspices of an EAP
counseling session. Id. at pp. 24-25. They advised Cunningham of a
situation where an employee had divulged that she was being
sexually harassed by a supervisor, and asked what they should do.
See Cunningham Aff. ¶¶ 6-7.  Cunningham insisted that they reveal
the purported victim's name, but they declined to do so until they
considered the matter further.

After this meeting, Daly decided to speak with Rosemary
Sleasman, a GSMB II employee who sat within ten feet of Plaintiff's
desk. Daly Dep. p. 26; State SOF ¶¶ 18-19.  Sleasman told Daly that
she was quite concerned for Plaintiff because of Tuck's conduct
toward her, that "they were all getting upset," and that "something

had to be done." Daly p. 27.[7]  When Daly asked Sleasman why she had not reported the situation to higher management officials such as John Lynch or Robert Bush, Sleasman stated that the employees were not "comfortable" going to management because management "wasn't doing anything for them anyway." Id.

There is some discrepancy as to what occurred next,[8] but there is no dispute that in early January, 2002, Cunningham became aware that it was Plaintiff who had raised concerns regarding sexual harassment by Tuck, her supervisor.  On January 2, 2002, Cunningham advised her supervisor, Neal Lane, of the allegations, and on January 3, 2002, she "prepared recommendations for Mr. Lane, which included meeting with defendant Tuck's supervisors." Cunningham Aff. ¶¶ 11-12.  On January 4, 2002, Cunningham met with Robert Bush to "advise him of the allegations and brief him on the topics to be discussed with Mr. Tuck's supervisors." Id. ¶ 13.  Bush was the supervisor of Tuck's supervisors. Id.  On January 8, 2002, Cunningham met with Tuck's supervisors, advised them of the allegations, and provided them with a copy of the sexual harassment

_____

[7] The referenced statements from Sleasman to Daly are considered only for the impact they may have had on Daly's state of mind, and not for the truth of the matter asserted.

[8] Daly testified that after meeting with Sleasman, Sleasman left and brought Plaintiff to Daly's office. Daly Dep. p. 36. Daly further testified that Plaintiff began telling Daly about the situation involving Tuck, and Daly observed that Plaintiff was visibly upset and frightened. Id. pp. 36-38. Daly testified that she took *Plaintiff* to Cunningham's office, and Plaintiff told Cunningham what had occurred in the workplace. Id. p. 38.

Cunningham asserts in her affidavit that Daly brought Sleasman to Cunningham's office and that it was Sleasman who identified Plaintiff as the "alleged victim" of the sexual harassment that Daly had talked about. See Cunningham Aff., ¶ 10. This fact was admitted by Plaintiff in response to the State's Statement of Facts. See State SOF 42.

policy. Id. ¶ 14.

On January 9, 2002, Cunningham contacted Plaintiff and asked to meet with her. Id. ¶ 16; see also LaMere Aff., ¶ 37.  At their meeting on January 11, 2002, Cunningham told Plaintiff that she was aware of the allegations of sexual harassment, and asked Plaintiff about them. Cunningham Aff. ¶ 16. Plaintiff told Cunningham that Tuck had engaged in unwanted conduct that included notes and memos as well as unwanted physical touching. Id.  Cunningham explained that NYSOFA did not condone sexual harassment, that Plaintiff had the right to file a formal complaint, and that Plaintiff should report any further instances of such conduct directly to Cunningham. Id. ¶ 17.

Plaintiff asserts that at the time she "was in such a frenzy and so emotionally distressed that [she does] not remember exactly what" Cunningham said to her. LaMere Aff. ¶ 67.  Plaintiff advised that she wanted to continue to keep the matter confidential and that she did not want to file a formal complaint because (1) she had applied for another position; (2) Tuck was holding an overdue evaluation over her head; and (3) she was fearful of retaliation if she filed a formal complaint.  Def. Ex. 45; Cunningham Aff. ¶¶ 16, 18.  Cunningham determined that, given the nature of the allegations, "NYSOFA had an obligation to investigate plaintiff's

claims." <u>Id.</u> ¶ 18.[9]  Cunningham also provided Plaintiff with a copy of NYSOFA's internal discrimination policy. LaMere Aff. ¶ 48.  This was the first time that Plaintiff had seen the policy or was even made aware of its existence. <u>Id.</u>

Cunningham then met with Lane and advised him that the allegations were more serious than initially believed. State SOF ¶ 49.  Lane set up a meeting on the same day, January 11, 2002, with Cunningham, Bush, Director of Personnel Dave Lang, and then-NYSOFA Director Patricia Pine (who participated by telephone). State SOF ¶ 50. This group determined to formally investigate the allegations, and Cunningham and Lang were chosen to conduct the investigation. State SOF ¶ 54.  Cunningham had conducted one such investigation in the past; Lang had never conducted such an investigation.  Bush insisted that he be involved in the investigation although Cunningham disagreed and felt that Bush's presence would inhibit people from speaking. Cunningham Dep. pp. 148-49, 170.

The group also agreed that Tuck would be confronted with the allegations on January 14, 2002 when he returned from vacation. <u>See</u> State SOF ¶ 55; Cunningham Aff. ¶ 23.  There was a discussion as to whether Plaintiff would be allowed to take January 14, 2002 off, or be situated at a separate location so as to prevent contact between the two after Tuck was confronted. <u>See</u> Cunningham Aff. ¶ 23; State

---

[9] It is unclear whether Plaintiff was aware, before she decided not to file a formal complaint, that the allegations would be investigated even without filing a formal complaint.

SOF ¶ 56-57.  Defendants contend that they agreed that Plaintiff should be given an option, see State SOF ¶ 56, and they discussed whether Plaintiff should be allowed to stay home without charging her time accruals. State Def. ¶ 57.  Cunningham recommended that Plaintiff not be required to charge accruals and directed the participant's attention to NYSOFA's Internal Discrimination Complaint Policy and Procedure that provided that no employee shall be compelled to charge accruals for time taken in conjunction with the complaint procedure. See Cunningham Aff. 23; Plf. Ex. 71.  Lang and Bush were adamant that if Plaintiff did not come to work on the 14th, she would have to charge her accruals because she did not file a formal complaint. See State SOF ¶ 58-60; Plf. Ex. 71. Ultimately, it was concluded that Plaintiff would not be afforded this protection.

Bush also meet with Plaintiff on January 11, 2002.  Plaintiff told Bush about Tuck squeezing and twisting her breasts, and Bush responded that "everyone needs to accept some humor." LaMere Dep. 386-393. The two discussed the options for January 14.  As to moving her desk to another location for the day, Plaintiff explained she felt this option would make it difficult for her to do her work since all of her files were at her desk near Tuck's office.  LaMere Aff. ¶ 43. In addition, she felt that by making her move but not making Tuck move, she was being inconvenienced and punished for complaining, and she was afraid such a move would

14

single her out as a complainer. Id.   ¶ 43.

Although it was agreed that Plaintiff would come to work and sit at a different location for the day, she decided after speaking by telephone with Bush on January 14th that she would stay home that day.  She contends that it was not made clear to her at the time that she would to have charge her personal time.  She later learned that she was required to charge to the day to her personal or annual leave time. LaMere Aff. ¶ 46.

Over the course of the following month, NYSOFA conducted its investigation into the allegations, including speaking to Plaintiff, Tuck, and a number of employees.  As is often the situation in cases such as this, there is much discrepancy as to what the employer learned during the investigation, and as to whether the employer's reaction to the information gathered during the investigation was reasonable. Tuck was not interviewed about the allegations until February 5, 2002.  When interviewed, he "acknowledged that he left suggestive notes and/or e-mails in [Plaintiff's] workplace and also acknowledged that he had physically touched plaintiff on the breasts."  Cunningham Aff. ¶ 27. Further, the investigation revealed that in 1995, Tuck had been counseled by his supervisors for calling another female employee a slut and publicly embarrassing her. See id. ¶ 19.

Despite this information from Tuck, as well as information gained from other sources that corroborated Cunningham's ultimate

15

conclusion that Tuck had engaged in sexual harassment, <u>see</u> Cunningham Aff., ¶¶ 19-21, 25-27, Defendants did not relieve Plaintiff of her obligation to report to Tuck.  Instead, management officials continued to affirmatively enforce the requirement that Plaintiff "continue to report to Tuck and he remained [her] supervisor."  LaMere Aff. ¶ 41. For instance, on January 29, 2002 Plaintiff learned that she was going to be hired in a position in another New York State agency that she had previously applied for. In an effort to avoid interaction with Tuck, Plaintiff e-mailed Defendant Lynch about the situation and advised him that before leaving she wanted to use her accrued vacation time. LaMere Aff. ¶ 56.  Lynch responded by telling Plaintiff that she had get Tuck's approval to use the vacation time, and that his determination would depend on what Tuck felt needed to be completed before she departed for the new position. <u>Id.</u>  Lynch set up a meeting between Plaintiff, Tuck, and others to discuss her departure. <u>Id.</u>

On February 13, 2002, Plaintiff was late for work because of traffic and, when she arrived at work, she e-mailed Lynch explaining her tardiness and indicating that she would make up the time by staying late. Lynch responded by reminding Plaintiff that "office procedure" was to "request approval" from Tuck. <u>Id.</u> ¶ 57.

On February 22, 2002, Plaintiff was ill and needed to call in sick. <u>Id.</u> ¶ 58.  "Instead of jumping through the same loops [*sic*] as in prior incidents, [Plaintiff] called and spoke to Tuck." <u>Id.</u>

When she told Tuck she was ill and would not be coming in that day, Tuck "responded by yelling at [Plaintiff] that [she] wasn't telling the truth."  Id.  Plaintiff contends that "Tuck's power and pull seemed so evident to [her] that [she] became scared. [Plaintiff] was afraid of [Tuck] getting [her] in trouble somehow so [she] immediately threw [her] clothes on and flew to work." Id. Plaintiff cried on the way to work and, once at work, went to Cunningham's office to report this incident. Id.  Cunningham was not in so Plaintiff reported the incident to Cunningham's assistant. See Cunningham Aff. ¶ 28. Cunningham asserts that Bush insisted on "micro-managing" the investigation and "impeded the communication whether or not [Plaintiff] was still being supervised by Tuck." Cunningham Dep. 332.  A meeting was set up between Plaintiff and Lane, and Plaintiff was given the option of moving her desk to another location on the third floor. LaMere Aff. 58; see Cunningham Aff. ¶ 28.[10]  Plaintiff claims she asked to have her files moved also, but that NYSOFA "chose not to accommodate this request." LaMere Aff. ¶ 58.

On February 25, 2002, Cunningham prepared a Memorandum detailing her findings regarding the investigation and concluding that Tuck had engaged in sexual harassment. Cunningham Aff. ¶ 29. The "penalty phase" of the investigation was then transferred to

_____

[10] Cunningham asserts that until the February 22, 2002, she "was unaware of any requests by Plaintiff to have her work station moved."  Cunningham Aff. ¶ 28.

NYSOFA's Counsel's Office. Id. ¶ 30. Tuck called in sick on February 25, 2002 and Plaintiff took the opportunity to move her desk to another location on the third floor despite the fact that her files were not being moved. LaMere Aff. ¶ 59.

On February 27, 2002, Plaintiff voluntarily moved her work space back near Tuck's workspace because she found the move to be inconvenient and because it upset her. Id. ¶ 59-60; State SOF ¶ 88. Plaintiff also complained to Cunningham that the investigation had been going over a month and that Tuck was still supervising her and that she did not feel that the agency was taking the matter seriously enough. See Plt. Ex. 54.

On March 4, 2002, Plaintiff was asked to meet with Cunningham and Daly, and they asked her to sign certain papers. Id. ¶ 60.  By then, Plaintiff had retained counsel who she contacted about the request.  It was Plaintiff's understanding that her counsel and representatives of NYSOF agreed that, as of that date, Plaintiff would no longer report to Tuck as her supervisor. Id.  Plaintiff's desk was relocated, this time to the fifth floor outside of Cunningham's office.  Id.

Plaintiff reported to this new work station the following day, March 5, 2002. Id.  However, around mid-day Plaintiff was "verbally accosted by Lynch" because Lynch discovered that Plaintiff had not reported to her work station on the third floor or reported to her "supervisor" - Jack Tuck. Id.  Lynch was angry and accused

18

Plaintiff of not being able to complete her work from the fifth floor. Id.  When Plaintiff explained that her attorney told her that she no longer had to report to Tuck, Lynch screamed: "Your attorneys do not sign your paychecks." Id.  Plaintiff began crying. Id.

On March 8, 2002, NYSOFA sent a Notice of Discipline to Tuck informing him that he had been found to have committed sexual harassment and advising him that the penalty would be termination. State SOF ¶ 67. Tuck grieved the Notice of Discipline, which necessitated a hearing. Id. ¶ 68. Plaintiff was subpoenaed to testify at Tuck's hearing but did not, id. ¶ 69, because, she asserts, "NYSOFA refused to grant even minimal protections against improper questioning, discovery and/or to address privacy concerns" and thus her attorney advised her not to testify. LaMere Aff. ¶ 71. NYSOFA entered a settlement with Tuck pursuant to which he was suspended for sixty (60) days without pay and agreed to retire or resign from state service on or before his fifty-fifth birthday. State SOF ¶ 70. Plaintiff filed charges of employment discrimination with the New York State Division of Human Rights on March 25, 2002. On April 15, 2002, Plaintiff served a Notice of Claim upon NYSOFA. Am. Comp. ¶ 29.

In the summer of 2002, NYSOFA conducted sexual harassment training for its employees.  Cunningham Dep. p. 324.  It was the first such training since 1995.  Plaintiff did not attend this

19

training. On December 12, 2002, "Plaintiff filed an action against Tuck in New York State Supreme Court in Rensselaer County (<u>LaMere v. Tuck</u>, Index No. 206990) based upon common law claims of intentional tort." <u>Id.</u> ¶ 34. On December 30, 2002, Plaintiff was issued a Right to Sue letter by the Equal Employment Opportunity Commission. <u>Id.</u> ¶ 31.

In January of 2003, there was another sexual harassment training course offered to employees who had not attended the summer 2002 program. <u>Id.</u> Plaintiff and two other employees were scheduled to attend this training. <u>Id.</u> Because one of the employees was unable to drive, Cunningham arranged for agency transportation for the training. <u>Id.</u> However, without consulting Cunningham and upon hearing that Plaintiff was one of the employees scheduled for this training, Defendant Bush canceled the accommodation for transportation. <u>Id.</u>; Plf. ex. 90. Plaintiff agreed to drive herself and the other employees to the training course. Cunningham reported to the New York State Inspector General's Office that she felt Bush's actions caused Plaintiff to suffer anxiety, negatively interfered with Cunningham's job responsibilities, and impeded the goal of providing sexual harassment training to employees. Cunningham Dep. pp. 256-328, 329; Plf. Ex. 90. Cunningham further indicted that she perceived Bush's conduct "to be an act of retaliation." Plf. Ex. 90.

Plaintiff commenced the instant action on March 24, 2003, <u>see</u>

20

dkt. # 1, and filed an Amended Complaint on May 20, 2003. <u>See</u> dkt. # 5. On February 18, 2005, the parties entered a stipulation that discontinued that much of Plaintiff's action asserting a constructive discharge. <u>See</u> dkt. # 57.  The instant motions seek to dismiss the remaining claims.

**IV. DISCUSSION**

**A.  Title VII- Individual Liability**

Title VII makes it unlawful for employers to discriminate against individuals based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  In this Circuit, individuals may not be held liable under Title VII. <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1314 (2d Cir. 1995); <u>see also</u> <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 377 (2d Cir. 2003)(affirming dismissal of plaintiff's Title VII claims against defendant in his personal capacity because "under Title VII individual supervisors are not subject to liability"). Thus, all Title VII claims brought against individual defendants are dismissed.

**B. Sexual Harassment Hostile Work Environment**

"[R]equiring people to work in a discriminatorily hostile or abusive environment" is prohibited by Title VII. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993); <u>see</u> <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65 (1986).  To establish a "hostile work environment" claim, Plaintiff must first show that her workplace was "permeated with discriminatory intimidation, ridicule, and

insult ... that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000)(internal quotations and citations omitted).  "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(internal quotations and citations omitted).

In determining whether an environment is sufficiently hostile or abusive, courts examine the totality of the circumstances including:

> (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) what psychological harm, if any, resulted.

La Marco v. New York State Nurses Assn., 118 F. Supp.2d 310, 316 (N.D.N.Y. 2000)(citing Faragher v. Boca Raton, 118 S. Ct. 2275, 2283 (1998)); see Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003); Richardson v. New York State Dep't of Correctional Servs., 180 F.3d 426, 437 (2d Cir. 1999).  In this regard, Plaintiff must assert a sexually objectionable environment that is "both objectively and subjectively offensive, one that a reasonable

22

person would find hostile or abusive and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 788.

Looking at the facts in totality and taking the evidence in the light most favorable to Plaintiff, a reasonable fact finder could find that the work environment was both objectively and subjectively hostile. Cruz, 202 F.3d at 570; Richardson, 180 F.3d at 436. A reasonable trier of fact could conclude that Tuck's conduct amounted to a steady barrage of insulting, demeaning, degrading, and sexually charged comments and actions that were not merely episodic but were sufficiently continuous and concerted so as to be deemed pervasive and frequent. They constituted more than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788.

Further, a reasonable fact finder could find that the conduct was severe. In this regard, a jury could conclude that Tuck's conduct amounted to crude sexual advances that would offend even the most reasonable sensibilities. His verbal and written statements and physical contact with Plaintiff's breasts and buttocks, even if intended as jokes or "horseplay," could be deemed by a reasonable fact finder as unwanted conduct serving no purpose other than to degrade, humiliate, and demoralize the Plaintiff. Accordingly, a reasonable trier of fact could conclude that the conduct was severe in that it was of the sort which "can and often

23

will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers, contrary to 'Title VII's broad rule of workplace equality.'" Gregory v. Daly, 243 F.3d 687, 693-94 (2d Cir. 2001)(quoting Harris, 510 U.S. at 22).

Plaintiff also asserts that she subjectively viewed the harassment as both pervasive and severe. Despite that Plaintiff willfully engaged in office horseplay when she first entered the fiscal unit under Tuck's supervision, she testified that Tuck escalated the conduct beyond that which was acceptable at the beginning, and that he refused to stop his barrage of conduct when Plaintiff asked him to do so. While there may be any number of reasons why Plaintiff did not do more to end the behavior earlier, examining those reasons is not the proper function of the Court on a motion for summary judgment. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)(court's role on summary judgment is not to decide issues of material fact, but to discern whether any exist).  On this record, it is patently a question of fact whether the conduct was subjectively viewed as unwanted, unwelcome, pervasive, and severe harassment. See Equal Employment Opportunity Comm. v. Rotary Corp., 297 F. Supp.2d 643, 662 (N.D.N.Y. 2003).

Viewing the totality of the facts in the light most favorable to the Plaintiff, a rational trier of fact could find that, because

of Tuck's conduct, the workplace was "permeated with discriminatory intimidation, ridicule, and insult, ... sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris, 510 U.S. at 21 (citation and internal quotation marks omitted). Further, based upon the sexualized nature of Tuck's statements and actions, a question of fact exists as to whether considerations of Plaintiff's gender motivated his conduct. See Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)("In discrimination cases, the inquiry into whether the plaintiff's sex ... caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a 'sparing' use of the summary judgment device because of juries' special advantages over judges in this area."); Williams v. Bd. of Hudson River/Black River Regulating Dist., 2001 WL 1217199 at *1 (N.D.N.Y. Sept. 23, 2001)(summary judgment denied where defendant asked plaintiff out on dates, started rumors that he was sexually involved with the plaintiff, and touched her at the office or at work-related events). Consequently, Plaintiff has established, for purposes of this motion, a *prima facie* case of sexual harassment discrimination. See Yerry v. Pizza Hut of Southeast Kansas, 186 F. Supp.2d 178, 184 (N.D.N.Y. 2002)(Hurd, J.).

### C.  Employer Liability - Title VII

The Court next turns to the question of whether there is a

25

basis for employer liability for the sexual harassment claim.

Under Title VII, there is a presumption that an employer is

vicariously liable for a hostile work environment created by a

supervisor of a victimized employee. See Burlington Indus., Inc. v.

Ellerth, 524 U.S. 742, 765 (1998).  There is no dispute that Tuck

was Plaintiff's supervisor for purposes of imputing liability to

the employer. See Mack v. Otis Elevator Co., 326 F.3d 116, 126 (2d

Cir. 2003). Plaintiff has not asserted that Tuck took a tangible

employment action against her and, therefore, the employer is

entitled to raise the Ellerth/Faragher affirmative defense to

liability under Title VII. See Caridad v. Metro-North Commuter

R.R., 191 F.3d 283, 294 (2d Cir. 1999).

> The defense comprises two necessary elements: (a) that
> the employer exercised reasonable care to prevent and
> correct promptly any sexually harassing behavior, and (b)
> that the plaintiff employee unreasonably failed to take
> advantage of any preventive or corrective opportunities
> provided by the employer or to avoid harm otherwise.

Ellerth, 524 U.S. at 765; Faragher v. City of Boca Raton, 524 U.S.

775, 807 (1998). The employer bears the burden of persuasion with

regard to proving both prongs of this affirmative defense. Ellerth,

524 U.S. at 765.

The employer argues that it is entitled to summary judgment

because it had an anti-harassment policy in place that Plaintiff

did not promptly take advantage of, and that, once she did

complain, it immediately investigated and remedied the situation.

The Court disagrees.

"[T]he mere existence of a grievance procedure ... coupled with [plaintiff's] failure to invoke that procedure does not serve to insulate an employer from liability on summary judgment." Robles v. Cox & Co., Inc., 154 F. Supp.2d 795, 805 (S.D.N.Y. 2001)(quoting Meritor Savings Bank, 477 U.S. at 72); see Bennett v. Progressive Corp., 225 F. Supp.2d 190, 206 (N.D.N.Y. 2002)("Indeed, merely showing that a plaintiff grasped the employer's management hierarchy, and knew where to direct general complaints, is insufficient to grant an employer's motion for summary judgment."). Similarly, "the mere demonstration of the existence of a written sexual harassment policy, though an important consideration, is in no way dispositive." Bennett, 225 F. Supp.2d at 206 (citing Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001)). "Instead, the policy should alert employees to management interest in specifically correcting sexual harassment" and "must [] be reasonably disseminated to the employees." Id. (citations omitted); see Hill v. The Children's Village, 196 F. Supp.2d 389, 398 (S.D.N.Y. 2002)("[M]erely possessing a written sexual harassment policy is insufficient to demonstrate reasonable care in preventing sexual harassment; the written policy must also be reasonably promulgated.")

Plaintiff has raised a material question of fact over whether the employer's policy was distributed or promulgated in a manner

that reasonably informed employees of their rights and how to report such conduct. <u>See</u> <u>Hill</u>, 196 F. Supp.2d at 398.  Plaintiff testified that she was unaware of the sexual harassment policy until after she took the initiative to contact the Employee Assistance Program Coordinator, Greg Gardiner.  Neither Gardiner nor Associate Counsel Daly were aware of the proper reporting procedures, and both thought the best course was to seek out Affirmative Action Coordinator Cunningham for advice. Daly further testified that there were no postings in the work place advising employees of such a policy. After Plaintiff's complaint was made known to Cunningham, Cunningham met with Tuck's supervisors and provided them with copies of the discrimination policy.

A finder of fact could conclude that the State failed to reasonably disseminate or promulgate a policy that effectively advised employees of their rights. The evidence, taken in the light most favorable to Plaintiff, indicates that whatever policy the employer had in place was not reasonably promulgated and made known to employees and supervisors in the workplace.  While "[a]n employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct," <u>Leopold</u>, 239 F.3d at 245, a fact finder could conclude that the employer's failure to reasonably disseminate its policy effectively deprived Plaintiff of a viable means to stop Tuck's behavior once it

28

"drastically changed" from harmless joking to sexual harassment. Therefore, on this motion, the affirmative defense fails under the first prong and summary judgment on this basis is denied. Bennett, 225 F. Supp.2d at 207 ("A factual dispute as to whether [Plaintiff] was aware of the sexual harassment policy alone is sufficient to defeat summary judgment on the affirmative defense.").

### D.  Retaliation

         Plaintiff also asserts that the employer retaliated against her after she reported the conduct to management. Defendants contend that Plaintiff cannot establish a *prima facie* case of unlawful retaliation.

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that: (1) she was engaged in protected activity; (2) the employer was aware of Plaintiff's participation in the protected activity; (3) the employer took adverse action against Plaintiff; and (4) a causal connection existed between the Plaintiff's protected activity and the adverse action taken by the employer. Mack, 326 F.3d at 129 (citing Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)). The burden of establishing this *prima facie* case in employment discrimination cases is "minimal." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); see also McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).

There can be no dispute that Plaintiff engaged in protected

29

activity that management was aware of when she reported Tuck's conduct to Cunningham. See Cruz, 202 F.3d at 566 (stating that "the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection"); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)(protected activities include "making complaints to management").  Rather, the central dispute is whether the employer took adverse action against her after this complaint.

Adverse action means a "materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).  To qualify as "materially adverse," such an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry, 336 F.3d at 138. "Adverse employment actions are considered material if they are 'of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Signer v. Tuffy, 66 Fed. Appx. 232, 2003 WL 1240611, at * 2 (2d Cir. March 18, 2003)(quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997)). Examples of sufficiently material adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities ...." Id.; see Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)(To be adverse, an employment action

30

must involve the deprivation of "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment.") (quoting <u>Karibian v. Columbia Univ.</u>, 14 F.3d 773, 778 (2d Cir. 1994)).

However, Title VII does not "define adverse employment action solely in terms of job termination or reduced wages and benefits," and "less flagrant reprisals may indeed be adverse." <u>Richardson</u>, 180 F.3d at 446 (quoting <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997)).  In this regard, the Second Circuit has "adopt[ed] the view that unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [third] prong of the retaliation *prima facie* case." <u>Id.</u>  "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" <u>Wanamaker</u>, 108 F.3d at 466.

Plaintiff's proof of an adverse action following her complaint is weak at best. She has proffered no evidence from which a reasonable jury could conclude that any one action by the employer constituted a materially adverse change in the terms and conditions of her employment.[11]  However, taking the evidence in the light most

---

[11] The single day that Plaintiff was required to charge her accruals did not constitute a material change in the terms and conditions of her employment, and the one-time denial of a transportation accommodation to the sexual harassment training course, even if intended as a form of retaliation, does not meet the materiality requirement to make the claim legally actionable.

favorable to Plaintiff, and considering her minimal burden of establishing her *prima facie* case, it is possible that a reasonable jury could conclude that the totality of the circumstances in the work place after her complaint amounted to a hostile work environment that changed the conditions of her employment for the worse. In this regard, a jury could conclude that the string of seemingly isolated events - the denial of day off without charging her accruals; the denial of the right to move her files; the insistence that she continue to report to Tuck and seek his approval on routine matters (such as whether she could take a day off because she was ill, or whether she could use her accrued vacation time); reprimanding her for not being on the third floor; and the last minute canceling of the transportation to the sexual harassment training - reached a "critical mass" that materially and adversely affected her job. See Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004)("Plaintiffs claim that [the Police Chief] also retaliated against them by creating a hostile work environment, alleging a string of isolated actions occurring over a multi-year period. With respect to hostile work environments, we have stated that '[o]ur precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.'")(quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)).

Indeed, Plaintiff asserts that she cried over incidents such

32

as being yelled at for being on the fifth floor and being accused of taking a sick day when she was not actually sick, and a reasonable jury could conclude that the employer created, via the supervisors' actions, an objectively and subjectively hostile environment for Plaintiff *because* she complained. "Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate." Richardson*,* 180 F.3d at 339.

Further, the majority of these actions were taken shortly after the commencement of the investigation into Tuck's conduct. This temporal proximity provides a sufficient basis to satisfy Plaintiff's minimal burden on the fourth element of the *prima facie* case. See Feingold*,* 366 F.3d at ("[T]he requirement that Feingold show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."); Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,* 263 F.3d 208, 224 (2d Cir. 2001)("'The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'")(quoting Cifra v. Gen. Elec. Co.*,* 252 F.3d 205, 216 (2d Cir. 2001)).  In addition, the record contains some indication that events that occurred later in time after the investigation (e.g. the canceling of the driving accommodation in January 2003) were

33

motivated by retaliatory animus. <u>See</u> Plf. Ex. 90. Thus, Plaintiff has satisfied her minimal burden of establishing a *prima facie* case of retaliation. Therefore, the motion for summary judgment on this basis is denied.

### E. State Law Claims against New York State.

Next, the Court turns to the state law claims brought against NYSOFA. A suit against a state agency or department constitutes a suit against a state for Eleventh Amendment purposes. <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 100 (1984). Congress has not abrogated New York State's Eleventh Amendment immunity as to the state law causes of action, and the State has not consented to such suits, <u>see</u> <u>id.</u> at 100-01, or waived its immunity. <u>See Richardson</u>, 180 F.3d at 448-49.  Inasmuch as NYSOFA is an agency and arm of New York State, <u>see</u> State SOF ¶ 1; N.Y. Elder L. ¶ 201 *et seq.*; <u>Mancuso v. N.Y. State Thruway Auth.</u>, 86 F.3d 289, 292-93 (2d Cir. 1996)(discussing the factors a court must consider in determining whether an entity is an arm of the state), all state law claims against NYSOFA, including the New York Human Rights Law claims, are barred by the Eleventh Amendment. <u>See Richardson</u>, 180 F.3d at 448-49; <u>Martin v. New York State Dept. of Correctional Service</u>, 224 F. Supp.2d 434, 441 (N.D.N.Y. 2002).  Accordingly, these claims against NYSOFA and the individual defendants in their official capacities are dismissed. <u>Briggs v. New York State DOT</u>, 233 F. Supp. 2d 367, 373 (N.D.N.Y. 2002). Based upon the doctrine

34

of comity, and out of deference to state sovereignty, the Court offers no opinion whether any of these claims are justiciable in state court.

### F.  Human Rights Law Claims against Individual Defendants

Next, the Court addresses the NYSHRL claims brought against the individual defendants in their individual capacities.

#### 1.  Sexual Harassment Claim

The NYSHRL provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice ... for an employer ... because of the ... sex ... of an individual ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. EXEC. L. § 296(1)(a). The New York courts "require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII," Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998), including hostile work environment/sexual harassment claims. Rotary Corp., 297 F. Supp.2d at 661. "In addition, the NYSHRL states that it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'" Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)(quoting N.Y. Exec. Law § 296(6)).

The Second Circuit has determined that a supervisor is an "employer" within the meaning of the NYSHRL, and subject to

35

personal liability, if the supervisor "'actually participates in the conduct giving rise to [the] discrimination.'" Feingold, 366 F.3d at 157 (quoting Tomka, 66 F.3d at 1317).  Further, the Second Circuit has recognized personal liability for a co-worker who "actually participate[s] in the conduct giving rise to a discrimination claim" irrespective of whether that co-worker had the authority to either hire or fire the Plaintiff. Feingold, 366 F.3d at 157-58 (citing Tomka, 66 F.3d at 1317)(quotations omitted).

Here, Tuck served as Plaintiff's supervisor and, as is apparent, is the individual who brought about the allegedly hostile work environment. While some courts have held that an individual cannot "aid or abet" his own conduct, this Court is compelled to follow the Second Circuit's Feingold decision and hold to the contrary. See Dawson v. County of Westchester, 351 F.Supp.2d 176, 199, fn. 14 (S.D.N.Y. 2004). Therefore, the motion to dismiss the NYSHRL discrimination claim against Tuck is denied.  Plaintiff has failed to proffer sufficient proof that any other employee participated in Tuck's conduct such that it could be said that another employee aided or abetted the discrimination.  Accordingly, the NYSHRL sexual harassment claim, other than against Tuck, is dismissed.

### 2.  Retaliation

The NYSHRL also provides that "[i]t shall be an unlawful discriminatory practice ... [f]or any employer ... to ...

discriminate against any person because [s]he has opposed any practices forbidden under this article or because [s]he has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(1)(e).  The courts apply the same standard to determining NYSHRL retaliation claims as they do to determining Title VII retaliation claims. See Phipps v. Comprehensive Community Development Corp., 2005 WL 287413, at * 11 (S.D.N.Y. Feb. 4, 2005).

Here, assuming arguendo that a jury could conclude that the employer retaliated by allowing a hostile work environment to be perpetrated against Plaintiff by the actions of various supervisors, Plaintiff has proffered sufficient proof that Defendants Tuck, Lane, Lynch, and Bush participated in or condoned the conduct. See Bennett, 225 F. Supp.2d at 210 ("Condonation contemplates a knowing, after the fact forgiveness or acceptance of an offense. An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation.")(citation omitted). These supervisors were made aware of the seriousness of Plaintiff's complaint and the agency's protocols during the investigation of sexual harassment complaints, but arguably took action intended to punish Plaintiff for complaining - including requiring Plaintiff to continue to report to Tuck and taking other actions which a reasonable jury could find were intended solely to negatively impact Plaintiff's

37

work life while the investigation continued. Each of these defendants served as supervisors above Plaintiff in NYSOFA's chain of command, and, under Plaintiff's facts, knew or should of known of the conduct of the others. Therefore, they may be held personally liable for any claim of retaliation that a jury might determine is properly proven.  Summary judgment on the NYSHRL retaliation claim against Tuck, Lane, Lynch, and Bush is denied.

### G. State Law Assault & Battery Claims

Plaintiff also asserts claims against Tuck for state common law assault and battery based on Tuck's conduct of pinching, grabbing, and squeezing her breast and buttocks "[c]ommencing in or about late summer 2001 and continuing through early January 2002." Am. Com. ¶ 100.  Tuck argues that: (1) Plaintiff fails to assert facts upon which an actionable claim for assault or battery may be based; and, (2) assuming, arguendo, that she states such facts, all such claims save the one premised on the touching of Plaintiff's buttocks at NYSOFA's 2002 Christmas party, are barred by the applicable statute of limitations.

Plaintiff has failed to establish proof from which a reasonable juror could conclude that Tuck placed her in imminent fear of bodily injury such to make out an actionable assault claim under New York common law. United Nat'l Ins. Co. v. Waterfront New York Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)(An assault is "an intentional placing of another person in fear of imminent

38

harmful or offensive conduct."); <u>Castro v. Local 1199, Nat'l Health and Human Servs. Employees Union</u>, 964 F. Supp. 719, 732 (S.D.N.Y. 1997)("[W]ords not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault.").  Accordingly, all assault claims are dismissed.

As to the battery claims, Plaintiff asserts that the accrual of the one (1) year statue of limitations was tolled while the discrimination claims were being investigated by the New York State Division of Human Rights.  While "[c]ourts in the Second Circuit are split on whether the statute of limitations with respect to a state law claim is tolled when a state claim arises from the same set of facts as a Title VII claim timely filed with the NYSHRL or the EEOC," <u>Duran v. Jamaica Hospital</u>, 216 F. Supp.2d 63, 67 (E.D.N.Y. 2002)(citing cases), this Court agrees with the reasoning of District Judge Garaufis in the <u>Duran</u> case rejecting such a tolling argument. <u>Id.</u> 216 F. Supp.2d at 67-68.  "Despite the laudable interest in judicial economy expressed by courts that have tolled the state statute of limitations, this court must respect the 'general principle that statute of limitations schemes are exclusively the prerogative of the legislature and, absent a clear legislative declaration that any tolling is permissible, the courts should be reluctant to imply one.'" <u>Id.</u> at 68 (quoting <u>Gardner v.</u>

St. Bonaventure Univ., 171 F. Supp.2d. 118, 131 (W.D.N.Y. 2001)).
Accordingly, the Court declines to the toll the statute of
limitations. Plaintiff's battery claims are limited to those
accruing on or after December 12, 2001. Accepting Plaintiff
rendition of the facts as true, this would limit her to the claim
for battery to the one time that Tuck grabbed her buttocks at
NYSOFA's 2001 Christmas party.

    Under New York common law, a battery "is a wrongful physical
contact with the person of another had by intention of the
wrongdoer and without the consent of the victim." Williams v. Port
Auth. of New York and New Jersey, 880 F. Supp. 980, 994 (E.D.N.Y.
1995). "'To recover damages for battery founded on bodily contact,
a plaintiff must prove that there was bodily contact, that the
contact was offensive, and that the defendant intended to make the
contact without the plaintiff's consent.'" Lucus v. South Nassau
Comm. Hosp., 54 F. Supp.2d 141, 151 (E.D.N.Y. 1998)(quoting Roe v.
Barad, 230 A.D.2d 839, 840 (2d Dep't 1996)).

> In a cause of action for battery, the required intent is
> merely that the defendant intentionally made bodily
> contact and that the intended contact was itself
> offensive or without consent. The test is what an
> ordinary person not unduly sensitive would find
> offensive. However, the slightest unlawful touching of
> the person of another is sufficient to show a battery
> because the law cannot draw the line between different
> degrees of violence and therefore totally prohibits the
> first and lowest stage.

Campoverde v. Sony Pictures Ent., 2002 WL 31163804, at * 11
(S.D.N.Y. Sept. 30, 2002)(interior quotation marks and citations

omitted).

On Plaintiff's asserted facts, she has a colorable claim for battery arising from Tuck's conduct at NYSOFA's 2001 Christmas party. Therefore, the motion is denied as to this occurrence, and granted in all other respects.

### H.  Negligent Hiring and Retention claims

To the extent that Plaintiff asserts that Defendants Lane, Lynch, and Bush are liable as the employer for the negligent hiring and retention of Tuck, the claim is barred by New York Workers' Compensation Law ("NYWCL"), which provides an exclusive remedy for negligence actions by an employee against his/her employer. Duran, 216 F. Supp.2d at 66.  The exclusivity provision of NYWCL provides that an employer's negligence liability under the NYWCL "shall be exclusive and in place of any other liability." N.Y. Work. Comp. § 11.  "Sister courts have consistently interpreted this provision to bar negligence claims brought in federal court by an employee against an employer." Duran, 216 F. Supp.2d at 66 (citing Walker v. Weight, 961 F. Supp. 32, 35 (E.D.N.Y.1997)(holding that negligent hiring and retention claims brought by an employee are barred by NYWCL); Chrzanowski v. Lichtman, 884 F. Supp. 751, 756 (W.D.N.Y. 1995)(concluding negligence claims are clearly barred by the exclusivity provision of the NYWCL)).

To the extent the negligence claims are premised upon these Defendants' exercise of their discretionary authority to hire or

fire an employee, they are entitled to absolute immunity. <u>See</u> <u>Aiken</u>
<u>v. Nixon</u>, 236 F. Supp.2d 211, 240 (N.D.N.Y. 2002)("Under New York
State law, 'when official action involves the use of discretion,
the officer is not liable for the injurious consequences of that
action even if resulting from negligence or malice.'")(quoting
<u>Tango v. Tulevech</u>, 61 N.Y.2d 34, 40, 471 N.Y.S.2d 73, 459 N.E.2d
182 (1983)), <u>aff'd</u> 80 Fed. Appx. 146, 2003 WL 22595837 (2d Cir.
2003). Summary judgment is granted dismissing the negligence
claims.

### I.  **Intentional Infliction of Emotional Distress**

Finally, Plaintiff fails to present argument or facts that
would support a cognizable claim for intentional infliction of
emotional distress. Like with the battery claim, the statute of
limitations for intentional infliction of emotional distress is one
year. <u>Dreizis v. Metropolitan Opera Ass'n</u>, 2004 WL 736882, at *4
(S.D.N.Y. Apr. 5, 2004)(citing N.Y. C.P.L.R. § 215(3)).  Other than
the one time that Tuck grabbed Plaintiff's buttocks at NYSOFA's
2001 Christmas party, the facts that form the basis of Plaintiff's
intentional infliction of emotional distress fall outside the
applicable statute of limitations period.

One incident of being grabbed in the buttocks does not rises
to the level of being "so outrageous in character, and so extreme
in degree, as to go beyond all possible bounds of decency, and to
be regarded as atrocious, and utterly intolerable in a civilized

42

society'" as is required to make out such a claim. Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993)(quoting Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)(citing Restatement (Second) Of Torts, § 46 cmt. d)); see Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999).[12]  The claim is therefore dismissed. See Thomas v. Bergdorf Goodman, Inc., 2004 WL 2979960, at * 11 (S.D.N.Y. Dec. 22, 2004).

## V. CONCLUSION

Based upon the above, defendants' motions for summary judgment [dkt. # 48 & # 49] are **GRANTED IN PART AND DENIED IN PART.  All causes of action are dismissed EXCEPT:**

(1) The Title VII sexual harassment claim against the New York State Office for the Aging;

(2) The New York Human Rights Law sexual harassment claim against Jack Tuck;

(3) The Title VII retaliation claim against the New York State Office for the Aging;

(4) The New York Human Rights Law retaliation claim against Jack Tuck, Neal Lane, John J. Lynch, and Robert Bush; and

(5) The New York State common law battery claim against Jack Tuck for conduct occurring at the New York State Office for the

---

[12] Under New York law, a claim for intentional infliction of emotional distress requires a showing of: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Stuto, 164 F.3d at 827.  Determining whether the alleged conduct is sufficiently outrageous to be actionable is a question of law for the court. Holwell, 81 N.Y.2d at 122.

Aging's 2001 Christmas party.

The parties shall submit their pre-trial papers by May 4, 2005, and be prepared to start the trial on the remaining claims on May 10, 2005.

**IT IS SO ORDERED**

DATED:April 27,2005


Thomas J. McAvoy
Senior, U.S. District Judge